UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
(CAMDEN VICINAGE)

| | |
|---|---|
| Russell and Laura Barrett, Individually & as H/W<br>1999 Berger Road<br>Kintnersville, PA 18930<br>   Plaintiffs,<br><br>   v.<br><br>Chris Morgan<br><br>Estate of Sean Neill<br>70 Mariner Drive<br>Sewell, NJ 08080<br><br>Countrywide Home Loans, Inc.<br>5401 N. Beach Street<br>FWBS 201<br>Fort Worth, TX 76137<br><br>WMC Mortgage<br>3100 Thornton Avenue<br>Burbank, CA 91504<br><br>E-Mortgage Management LLC<br>222 Haddon Avenue, Suite 2-A<br>Haddon Township, NJ 08108<br><br>   Defendants. | Civil Action No. 1:10-cv-01256-RMB |

**SECOND AMENDED COMPLAINT - CIVIL ACTION**

    **I.**    **Preliminary Statement**

1.    This is an action for an award of attorney's fees and costs, compensatory, statutory, treble and punitive damages, also seeking equitable, injunctive and other relief, for Defendants' deed (conversion, "Foreclosure Rescue Scam", deed conversion, unfair or deceptive acts and practices ("UDAP"), conspiracy and/or aiding and abetting same.

2.    Individually, jointly and/or severally, Defendants are liable to Plaintiffs for, but not

limited to, the below causes of action and aforesaid remedies, for the reasons stated, which reasons are currently known, upon information and/or belief, and/or will be proven in discovery and/or at trial.

3. At all times material, Plaintiffs here reserve the right to rely on the "Discovery Rule" and/or the Doctrine(s) of Equitable Tolling/Fraudulent Concealment, respectively.

## II. Jurisdiction and Venue

4. Jurisdiction in this Honorable Court is based on Jurisdiction in this Honorable Court is based on federal question conferred by 15 U.S.C §1679.; supplemental jurisdiction over state law claims is granted by 28 U.S.C. §1367.

5. Venue lies in this District in that the events giving rise to this claim occurred here, at least one (1) Defendant resides, maintains a principal place of business, is incorporated or does business here, or the subject of this action is situated within this district.

## III. Parties

6. Plaintiffs, Russell and Laura Barrett (collectively "Plaintiffs"), are adult individuals and/or husband and wife, currently residing and/or at all times material were residing at the above-captioned address ("Property" or "home").

7. Defendant, Chris Morgan ("Morgan"), is an adult individual doing business at the above captioned address, at all times material herein, acted individually and/or doing business as an officer and/or member of mortgage broker, New Millennium Financial, LLC.

8. Upon information and belief, New Millennium, a corporation under and by virtue of the laws of the Commonwealth of Pennsylvania, is believed to be defunct based on its last known place of business of 8420 Bustleton Avenue, Philadelphia, housing a new business and there

otherwise being no information to indicate its continued operation elsewhere.

9. Defendant E-Mortgage Management LLC ("E-Mortgage") is a mortgage broker is a duly incorporated corporation under and by virtue of the laws of the State of New Jersey, maintaining a principle place of business at the above captioned address. At all times material E-Mortgage acted as broker for the 1st position mortgage loan made to plaintiffs and as co-broker for the 2nd position mortgage loan made to plaintiffs as described herein.

10. Defendant, Sean Neill ("Neill"), is an adult individual doing business at the above captioned address, at all times material acting individually and/or doing business as an officer, member, and/or employee of E-Management.

11. Defendant, Countrywide Home Loans, Inc ("Countrywide"), is a duly incorporated corporation under and by virtue of the laws of the Commonwealth of Pennsylvania, maintaining a principle place of business at the above captioned address, at all times material acting as the refinancing lender.

12. Defendant WMC Mortgage ("WMC") is a corporation engaged in the business of sub-prime consumer lending as a correspondent lender for Defendant Countrywide in the Commonwealth Pennsylvania with principal offices at 3100 Thornton Avenue, Burbank, CA 91504. As a correspondent lender for Countrywide, Countrywide retained all powers of final approval over underwriting of the loans given to plaintiffs as described herein.

13. Defendants, John Does 1-10, at all times material were and/or are agents, servants, work persons, employees and/or affiliates of the above defendants and/or are liable hereunder.

14. At all times material, Defendants were acting individually, within the course and scope of their authority and employment, and/or through their agents, servants, work-persons, and/or employees, respectively.

15.     At all times material, Defendants acted individually and/or on behalf of each other as agents, servants, work-persons, alter egos, and/or 1employees thereof.

16.     Defendants are liable to Plaintiffs, directly, indirectly, contractually, expressly, implicitly, as a matter of law and/or vicariously, including but not limited to liability via a third-party beneficiary relationship, and/or via conspiring and/or aiding and abetting.

### IV. Facts

17.     In or around 2006, Plaintiffs fell behind on their mortgage upon which foreclosure judgment was entered against them on or about August 30, 2006. (Bucks.C.C.P. No. 200606400).

18.     Plaintiffs' Sheriff's Sale was scheduled for January 12, 2007.

19.     On or about October 26, 2006, Plaintiffs received a telephone call from Defendant, Morgan, advising he was an employee of Defendant, New Millennium, claiming he could help Plaintiffs refinance their mortgage out of and rescue their home from the pending Foreclosure.

20.     On or about November 6, 2006, Defendant, Morgan, called Plaintiffs and informed then that he would be able to have their then delinquent mortgage refinanced to a new loan with monthly payments of $3,117.00.

21.     On or about November 27, 2006, Defendant, Morgan, called Plaintiffs and informed them that Morgan knew that the proposed monthly payments would be too costly for Plaintiffs to afford, and that he would put Plaintiffs in touch with a representative from E- Mortgage who could help Plaintiffs resolve their mortgage problems.

22.     Upon information and belief, Defendant Morgan transferred Plaintiffs' file, which included all of Plaintiffs' information and history, to defendant Neill at E-Mortgage without previously informing or asking Plaintiffs for permission.

23. On or about November 28, 2006, Defendant Neill called Plaintiffs advising he was an employee of E-Mortgage and informed Plaintiffs that, through a "lease to buy back" program, Neill could obtain for Plaintiffs a lower monthly payment enabling Plaintiffs to additionally take cash-out from Plaintiffs' equity after closing of the loan in as soon as fourteen (14) days.

24. Neill explained to Plaintiffs that through the lease to buy back program would give Plaintiffs cash out, a lease would be signed at settlement, and an investor would purchase the property for an amount to cover the prior mortgage.

25. In or around December 1, 2006, plaintiffs spoke with Neill about preliminary papers they had signed with a company called Fresh Start Financial Services involving a lease buy back program, borrowing of equity after sale to the investor to pay monthly lease payments, and assistance with credit repair over a 12 to 24 month period.

26. Neill discouraged plaintiffs from going to Fresh Start and promised that they would receive credit repair through the program he had proposed to them.

27. On multiple occasions between November 28, 2006 and December 14, 2006, Plaintiffs attempted to get a copy of the lease agreement from Defendant Neill.

28. Neill refused to provide Plaintiffs with a copy of the lease agreement.

29. On or about December 1, 2006, Neill advised Plaintiffs to have no dealings with Fresh Start Financial Services (non-party), another company offering lease to buy back services that had contacted Plaintiffs.

29. Relying on Neill's assertions that Fresh Start was not trustworthy, Plaintiffs proceeded with the offer from Neill and stopped other attempts to save their property.

30. On or about December 1, 2006, Defendant, Morgan, arranged for an appraisal of Plaintiffs' property purportedly for the refinance lender. During this period, Plaintiffs' property

was appraised at $485,500.00. On or around December 14, 2006, Plaintiffs "closed" on this refinance.

31.     Neill told Plaintiffs that $48,000 would be placed in escrow from the refinancing of the property's equity to pay the new refinancing loan's monthly payments and build up their credit rating so that they could refinance at a lower rate later on.

32.     Neill told Plaintiffs that closing would be at 11 a.m. at the offices of Washington Abstract in Philadelphia, PA.

**The Closing**

33.     Neill told Plaintiffs to arrive 15 minutes early; which Plaintiffs did, arriving at Washington Abstract's office at 10:45 on December 14, 2006.

34.     Upon arriving at the office, Plaintiffs were advised that Neill was not there.

35.     At approximately 1:30 on the day of closing, Plaintiffs were told by Defendant Morgan that Neill would be there in approximately 45 minutes to one (1) hour.

36.     Neill did not arrive until approximately 4:45 p.m.

37.     At closing, by design, Neill, showed up over five (5) hours late and then pressured Plaintiffs into signing the closing document loan by claiming that he had spoken with Plaintiffs' foreclosing lender, Tribeca Mortgage (non-party), and that Tribeca Mortgage was going to sell Plaintiffs' residence the next day at Sheriff's foreclosure Sale if the closing documents were not signed immediately.

38.     To further pressure and rush Plaintiffs, Neill advised Plaintiffs that if Tribeca did not receive the payment before 5 p.m. Tribeca would refuse the payment and take Plaintiffs' home.

39.     At all times material, there was not a Sheriff's Sale scheduled for the day after the closing, as was known to Neill.

40. In fact, the Sheriff's Sale was scheduled for January 12, 2007. Bucks C.C.P. No. 200606400.

41. Defendant Neill confirmed to Plaintiffs that their monthly mortgage payments thorough E-Mortgage was to be $2,300.00.

42. Defendants Neill and the closer for Washington Abstract did not answer Plaintiffs about the $48,000.00 escrow amount and where it was going to be held.

43. Upon information and belief, an escrow for $48,000.00 was not created.

44. At closing, Defendants Neill and E-Mortgage actually transferred the title and deed of the premises to Ortiz by arranging for two (2) loans to be made to the straw buyer Ortiz, one for $332,000 and one for $83,000.

45. From the aforesaid loan proceeds, after payoff of plaintiffs' existing mortgage loan to Tribeca, Neill was paid $92,351.13, said amount being listed on and described in the HUD1 for the loans as "For Services Rendered" without further description of any kind.

46. WMC and Countrywide approved the HUD1 before signing by any of the parties.

47. In reliance upon seeing that funds were set aside in association with Neill as indicated by the HUD1, plaintiffs signed the documents that resulted in transfer of their property.

48. Defendant E-Mortgage was paid over $15,000 to broker the loan transactions.

49. Defendant Neill never provided Plaintiffs with disclosures, notices, or other "loan" documents at closing or any time thereafter, even though Plaintiffs have requested them on numerous occasions.

**Post-Closing**

50. After the closing, Neill advised Plaintiffs that due to the late time he could not supply them with copies of the paperwork.

51.  Despite repeated request, no Defendants ever supplied plaintiffs with copies of any documentation concerning the loan, including but not limited to the settlement statement and all material disclosures such as a Truth in Lending summary or Notices or Right to Cancel.

52.  Plaintiffs also discovered that there were two (2) loans on the premises totaling approximately $3,500.00 per month, which previously undisclosed to Plaintiffs.

53.  As was known, Plaintiffs would not be able to afford the above payments.

54.  In or around January 2007, Plaintiffs started receiving mortgage statements at their residence, addressed to Cynthia Ortiz, which is when Plaintiffs discovered Defendants fraudulently transferred title.

55.  Plaintiffs discovered Defendants' deceit when Plaintiffs received a foreclosure lawsuit.

56.  On or about June 12, 2008, Plaintiffs' residence was sold at Sheriff's Sale.

57.  At all times material, Plaintiffs timely made their "mortgage" payments to Defendants.

58.  At all times material, Plaintiffs believed they were entering a mortgage refinance and had no intention of selling their home.

59.  At all times material, Plaintiffs were the implied borrowers on the loans.

60.  As a result of the foregoing, Plaintiffs have suffered injuries including, but not limited to: (1) pain and suffering, including emotional distress and embarrassment; (2) damage to credit rating and/or credit defamation; (3) financial loss(es), including lost opportunity(ies) and/or equity; (4) loss and/or possible loss of the premises; (5) attorneys fees and court costs; and/or (6) such other and further injuries as will be determined in discovery and/or at trial, including aggravation of a pre-existing condition(s).

    **V.  Causes of Action**

61.  Paragraphs above are incorporated by reference as if fully set forth at length herein and

below.

## <u>COUNT I</u> - Credit Repair Organizations Act ("CROA")
*(Plaintiffs v. Neill, E-Mortgage)*

62. Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

63. At all times material, Plaintiff was a "consumer" as defined by 15 U.S.C & §1679(a)(1).

64. At all times material, Neill, individually, and together with E-Mortgage each constituted a "credit repair organization" as defined by 15 U.S.C §1679(a)(3).

65. For the reasons before said at all times material Defendants were in violation of 15 U.S.C §1679, et seq. including but not limited to violating the "Prohibited Practices" section of the Act as follows:

> (a) "make or use any untrue or misleading representation of the services of the credit repair organization; or…"
>
> (b) "engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization."

## <u>COUNT II</u>
## Unfair Trade Practices And Consumer Protection Law ("UTPCPL")

66. Plaintiffs incorporate all facts and allegations set forth elsewhere in this Complaint.

67. The Defendants made the following representations expressly or impliedly to the plaintiff:

> (a) Morgan represented that Neill was a trusted colleague who could help plaintiff's save their home as a legitimate financial professional;
>
> (b) Neill, individually and on behalf of E-Mortgage, represented that he could sell plaintiffs' home to an investor and cash out equity that would be escrowed to assist them in financing repurchase of the property;

    (c) Defendant Neill represented Neill's services for $92,351 as real and legitimately incurred by placing them on the HUD1;

    (d) WMC and Countrywide joined in the aforesaid misrepresentation by approving the HUD1 prior to closing and paying the bogus fees to Neill by its underwriting of the loan transactions;

    (e) Defendant Neill represented that defendant brought $24,432 cash to the transaction;

    (f) Neill represented that there was equity remaining in the property and in escrow after the Loan Transaction;

    (g) Defendant E-Mortgage represented that they were financing a loan to rescue rather than steal plaintiffs' home.

68.     The representations and/omissions of Defendants Neill, E-Mortgage, and Morgan described in the prior paragraph were known or should have been known to those defendants to be false when made, were material in nature, and were made with the intent to deceive and defraud the plaintiffs into selling their home so that said defendants could strip tens of thousands from the home's equity and share it amongst themselves as well as charging for other services associated with the loan.

69.     Defendants WMC and Countrywide knew or should have known that $92,351 paid to Defendant Neill on the HUD1 under the general rubric of "services rendered" was false and not for real incurred services and that, as a direct consequence thereof, the entire transaction was a scam to strip equity form plaintiffs' home.

70.     Defendant E-Mortgage knew or should have known that it was funding a scheme by Neill to cheat plaintiffs out of the equity in their home rather than rescue them from foreclosure.

71.     Defendants Neill and E-Mortgage knew that the plaintiff had no special knowledge in the nuances of credit repair programs and foreclosure rescue transactions and would rely on their representations as to the intent and details of the Loan Transaction and its aftermath.

72. Defendants WMC and Countrywide knew that it was going to sell the loan immediately into a Wall Street loan trust and therefore abdicated any duty of due diligence into the particulars of the loan to collect its short term profit from that deal.

73. The plaintiffs justifiably relied on Defendants' misrepresentations before, during, and after the Loan transactions that their home was going to be saved by the escrow of funds for lease back and credit repair.

74. As a result of the aforementioned conduct, the plaintiff suffered the damages outlined above and below in addition to extreme mental anguish, frustration, humiliation, embarrassment and stress.

75. The defendants' actions as hereinbefore described, including but not limited to using a fraudulent lease back/credit repair scheme to take plaintiffs' home, were reckless, outrageous, willful, and wanton, thereby justifying the imposition of exemplary, treble and/or punitive damages.

76. Defendants Neill and Countrywide were involved in an almost identical sale/lease back scam under the pre-text of saving homeowners from foreclosure, see <u>Ramuno v. Lund et al</u>., Philadelphia Court of Common Pleas No. 0907 03011.

78. The UTPCPL proscribes, *inter alia*, engaging in any "unfair or deceptive acts and practices" either at, prior to, or subsequent to a consumer transaction.

79. The fraudulent actions of Defendants described above constitute unfair or deceptive acts and practices under UTPCPL, additionally including, but not limited to the following, *inter alia*:

   a) Defendants engaged in fraudulent or deceptive conduct which created a likelihood of confusion or of misunderstanding as to the credit repair, Loans, and foreclosure rescue, 73 P.S. §201-2(xxi);

   b) Defendants misrepresented the characteristics or benefits of the loans, the credit repair program, and foreclosure rescue, 73 P.S. § 201-2 (4)(v);

11

    c) Defendants caused a likelihood of confusion or a misunderstanding as to the service, sponsorship, approval or certification of services of Neill and E-Mortgage, 73 P.S. § 201-2 (4) (v); and

    d) Defendants misrepresented the loans' sponsorship and/or approval, 73 P.S. § 201-2 (4) (ii).

**VI. Prayer for Relief**

WHEREFORE, Plaintiff requests this Honorable Court enter judgment in their favor and against Defendants, individually, jointly and/or severally, in an amount in excess of seventy-five thousand dollars ($75,000), plus such other and further relief as this Honorable Court deems necessary and just, and to Order the following relief:

    a. Termination of any security interest in Plaintiff's property which may have been created under the loan;
    b. Actual damages in the amount of over $100,000 in equity extracted from the loans including cash and all loan charges for the fraudulent transaction;
    c. Treble Damages;
    d. Statutory damages;
    e. Attorneys fees and expenses, and costs of suit; and
    f. Punitive Damages.

    PROCHNIAK WEISBERG, P.C.

    /s/ Matthew B. Weisberg, Esquire
    MATTHEW B. WEISBERG, ESQ.
    Attorneys for Plaintiff